1 | TRACY L. WILKISON
Acting United States Attorney
2 | SCOTT M. GARRINGER
Assistant United States Attorney
3 | Chief, Criminal Division
JOSEPH O. JOHNS (Cal. Bar No. 144524)
4 | MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
Assistant United States Attorneys
5 | Environmental and Community Safety Crimes Section
    1300 United States Courthouse
6 |     312 North Spring Street
    Los Angeles, California 90012
7 |     Telephone: (213) 894-4536/8644
    Facsimile: (213) 894-0141
8 |     E-mail:  joseph.johns@usdoj.gov
            matthew.o'brien@usdoj.gov
9 |
    Attorneys for Plaintiff
10 | UNITED STATES OF AMERICA

11 |                 UNITED STATES DISTRICT COURT

12 |            FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 13 \| UNITED STATES OF AMERICA, | ED CR No. 5:18-00114(B)-VAP |
| | ED CR No. 5:21-00170-VAP |
| 14 \|     Plaintiff, | |
| | CONSOLIDATED PLEA AGREEMENT FOR |
| 15 \|         v. | DEFENDANT CARL BRADLEY JOHANSSON |
| 16 \| NATIONAL DISTRIBUTION SERVICES, | Hearing Date: August 13, 2021 |
| INC., | Hearing Time: 10:00 a.m. |
| 17 \|   aka "NDSI," | Location:  Courtroom of the |
| WHOLESALE DISTRIBUTION, INC., |          Hon. Virginia A. |
| 18 \|   dba "Quality Services," |          Phillips |
| CARL BRADLEY JOHANSSON, | |
| 19 \|   aka "Brad Johnson," | |
|   aka "Carl Johnson," | |
| 20 \|   aka "C. Brad Johanson," | |
|   aka "Keith Golatta," | |
| 21 \| ENRIQUE GARCIA, | |
|   aka "Henry Garcia," and | |
| 22 \| DONALD CAMERON SPICER, | |
| 23 \|       Defendants. | |
| 24 \| | |
| *And the additional following* | |
| 25 \| *case* | |
| 26 \| | |
| 27 \| | |
| 28 \| | |

1 | UNITED STATES OF AMERICA,

2 |        Plaintiff,

3 |           v.

4 | WESTERN DISTRIBUTION, LLC,
    aka "Advanced Distribution

5 |       Inc.," and
CARL BRADLEY JOHANSSON,

6 |    aka "Brad Johnson,"
   aka "Carl Johnson,"

7 |    aka "C. Brad Johanson,"
   aka "Jay Johnson,"

8 |    aka "Keith Golatta,"

9 | Defendants

10

11     1.    This constitutes the plea agreement between CARL BRADLEY

12 JOHANSSON ("defendant") and the United States Attorney's Office for

13 the Central District of California (the "USAO") in the two, above-

14 captioned cases.  This agreement is limited to the USAO and cannot

15 bind any other federal, state, local, or foreign prosecuting,

16 enforcement, administrative, or regulatory authorities.

17                       DEFENDANT'S OBLIGATIONS

18     2.    Defendant agrees to:

19           a.    At the earliest opportunity requested by the USAO and

20 provided by the Court, appear and plead guilty to counts one, two,

21 and four of the second superseding indictment in United States v.

22 National Distribution Services, Inc., et al., ED CR No. 5:18-

23 00114(B)-VAP, which charge defendant with Conspiracy, in violation of

24 18 U.S.C. § 371, Welding without Required Certifications, in

25 violation of 49 U.S.C. § 5124 and 49 C.F.R. § 180.413(a)(1), and Tax

26 Evasion, in violation of 26 U.S.C. § 7201; and to appear and plead

27 guilty to counts one and three of the indictment in United States v.

28 Western Distribution, LLC, et al., ED CR No. 5:21-00170-VAP, which

1  charge defendant with Conspiracy to Commit Bank Fraud/Committed while
2  on Pre-trial Release, in violation of 18 U.S.C. §§ 1349 and 3147, and
3  Bank Fraud/Committed while on Pre-trial Release, in violation of 18
4  U.S.C. §§ 1344(2) and 3147.

5          b.    Not contest facts agreed to in this agreement.

6          c.    Abide by all agreements regarding sentencing contained
7  in this agreement.

8          d.    Appear for all court appearances, surrender as ordered
9  for service of sentence, obey all conditions of any bond, and obey
10  any other ongoing court order in this matter.

11          e.    Not commit any crime; however, offenses that would be
12  excluded for sentencing purposes under United States Sentencing
13  Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not
14  within the scope of this agreement.

15          f.    Be truthful at all times with the United States
16  Probation and Pretrial Services Office and the Court.

17          g.    Pay the applicable special assessments at or before
18  the time of sentencing unless defendant has demonstrated a lack of
19  ability to pay such assessments.

20          h.    Pay restitution in an amount to be determined by the
21  Court to the victims of the criminal conduct alleged in count two of
22  the second superseding indictment in United States v. National
23  Distribution Services, Inc., et al., ED CR No. 5:18-00114(B)-VAP,
24  namely, Daniel Lopez Velasquez and the beneficiaries of decedent
25  Samuel Enciso.

26          i.    Defendant agrees that any and all criminal debt,
27  including restitution and payment of taxes owed, as ordered by the
28  Court will be due in full and immediately, and paid in accordance

3

1  with any payment schedule determined by the Court.  The government is
2  not precluded from pursuing, in excess of any payment schedule set by
3  the Court, any and all available remedies by which to satisfy
4  defendant's payment of the full financial obligation, including
5  referral to the Treasury Offset Program.

6           j.    Complete the Financial Disclosure Statement on a form
7  provided by the USAO and, within 30 days of defendant's entry of a
8  guilty plea, deliver the signed and dated statement, along with all
9  of the documents requested therein, to the USAO by either email at
10 usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial
11 Litigation Section at 300 North Los Angeles Street, Suite 7516, Los
12 Angeles, CA 90012.  Defendant agrees that defendant's ability to pay
13 criminal debt shall be assessed based on the completed Financial
14 Disclosure Statement and all required supporting documents, as well
15 as other relevant information relating to ability to pay.

16          k.    Authorize the USAO to obtain a credit report upon
17 returning a signed copy of this plea agreement.

18          l.    Consent to the USAO inspecting and copying all of
19 defendant's financial documents and financial information held by the
20 United States Probation and Pretrial Services Office.

21      3.    Defendant admits that defendant received $1,174,173 of
22 unreported income for the years 2012, 2013, 2014, 2015, 2016, and
23 2017.  Defendant agrees to cooperate with the Internal Revenue
24 Service in the determination of defendant's tax liability for the
25 years 2012, 2013, 2014, 2015, 2016, and 2017.  Defendant further
26 agrees that:

27          a.    Defendant will file, prior to the time of sentencing,
28 initial returns for the years subject to the above admissions,

4

1  correctly reporting unreported income; will, if requested to do so by
2  the Internal Revenue Service, provide the Internal Revenue Service
3  with information regarding the years covered by the returns; will pay
4  to the Fiscal Clerk of the Court at or before sentencing all
5  additional taxes and all penalties and interest assessed by the
6  Internal Revenue Service on the basis of the returns; and will
7  promptly pay to the Fiscal Clerk of the Court all additional taxes
8  and all penalties and interest thereafter determined by the Internal
9  Revenue Service to be owing as a result of any computational errors.
10  Payments may be made to the Clerk, United States District Court,
11  Fiscal Department, 255 East Temple Street, Room 1178, Los Angeles,
12  California 90012.

13       b.    Nothing in this agreement forecloses or limits the
14  ability of the Internal Revenue Service to examine and make
15  adjustments to defendant's returns after they are filed.

16       c.    Defendant will not, after filing the returns, file any
17  claim for refund of taxes, penalties, or interest for amounts
18  attributable to the returns filed in connection with this plea
19  agreement.

20       d.    Defendant is liable for the fraud penalty imposed by
21  the Internal Revenue Code, 26 U.S.C. § 6651(f), on the understatement
22  of tax liability for the years 2012, 2013, 2014, 2015, 2016, and
23  2017.

24       e.    Defendant gives up any and all objections that could
25  be asserted to the Examination Division of the Internal Revenue
26  Service receiving materials or information obtained during the
27  criminal investigation of this matter, including materials and
28  information obtained through grand jury subpoenas.

1          f.    Defendant will sign closing agreements with the
2    Internal Revenue Service at least two weeks prior to his sentencing
3    hearing, permitting the Internal Revenue Service to assess and
4    collect the total sum of $298,562 ($52,045, $59,851, $50,735,
5    $45,235, $42,002, and $48,694 for the defendant's tax years 2012,
6    2013, 2014, 2015, 2016, and 2017, respectively), which comprises the
7    tax liabilities, as well as assess and collect the civil fraud
8    penalty for each year and statutory interest, on the tax liabilities,
9    as provided by law.

10                          THE USAO'S OBLIGATIONS

11       4.    The USAO agrees to:

12            a.    Not contest facts agreed to in this agreement.

13            b.    Abide by all agreements regarding sentencing contained
14    in this agreement.

15            c.    Not to charge any additional officers of co-defendant
16    Western Distribution, LLC for criminal conduct related to the
17    allegations set forth in the indictment in United States v. Western
18    Distribution, LLC, et al., ED CR No. 5:21-00170-VAP.

19            d.    At the time of sentencing, move to dismiss the
20    remaining counts of the second superseding indictment, first
21    superseding indictment, and the underlying indictment for United
22    States v. National Distribution Services, Inc., et al., ED CR No.
23    5:18-00114(B)-VAP, as against defendant; and to further dismiss the
24    remaining counts of the indictment in United States v. Western
25    Distribution, LLC, et al., ED CR No. 5:21-00170-VAP, as against
26    defendant.  Defendant agrees, however, that at the time of sentencing
27    the Court may consider any dismissed charges from both criminal cases
28    in determining the applicable Sentencing Guidelines range, the

1 propriety and extent of any departure from that range, and the
2 sentence to be imposed.

3          e.    At the time of sentencing, provided that defendant
4 demonstrates an acceptance of responsibility for the offenses up to
5 and including the time of sentencing, recommend a two-level reduction
6 in the applicable Sentencing Guidelines offense level, pursuant to
7 U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an
8 additional one-level reduction if available under that section.

9          f.    Not to recommend a sentence of imprisonment greater
10 than ten years in length.

11          g.    Except for criminal tax violations (including
12 conspiracy to commit such violations chargeable under 18 U.S.C.
13 § 371), not further criminally prosecute defendant for violations
14 arising out of defendant's conduct described in the agreed-to factual
15 basis attached to this agreement as Exhibit 1.  Defendant understands
16 that the USAO is free to criminally prosecute defendant for any other
17 unlawful past conduct or any unlawful conduct that occurs after the
18 date of this agreement.  Defendant agrees that at the time of
19 sentencing the Court may consider the uncharged conduct in
20 determining the applicable Sentencing Guidelines range, the propriety
21 and extent of any departure from that range, and the sentence to be
22 imposed after consideration of the Sentencing Guidelines and all
23 other relevant factors under 18 U.S.C. § 3553(a).

24          h.    Not seek or pursue forfeiture of the $500,000 secured
25 bond posted by defendant's sister and brother-in-law in support of
26 his pre-trial release in 2018 for the matter United States v.
27 National Distribution Services, Inc., et al., ED CR No. 5:18-
28 00114(B)-VAP.

7

1

## NATURE OF THE OFFENSES

2        5.    Defendant understands that for defendant to be guilty of
3   the crime charged in count one of the case United States v. National
4   Distribution Services, Inc., et al., ED CR No. 5:18-00114(B)-VAP,
5   that is, Conspiracy, in violation of 18 U.S.C. § 371, the following
6   must be true: (1) beginning on or about a date unknown, and ending on
7   or about April 15, 2018, there was an agreement between two or more
8   persons to defraud the United States by obstructing the lawful
9   functions of the United States Department of Transportation efforts
10  to investigate and enforce the federal laws and regulations related
11  to out-of-service orders, reincarnated carriers, and the "R" Stamp
12  and purging requirements for cargo-tank repair work, by deceitful or
13  dishonest means; (2) defendant became a member of the conspiracy
14  knowing of at least one of its objects and intending to help
15  accomplish it; and (3) one of the members of the conspiracy performed
16  at least one overt act for the purpose of carrying out the
17  conspiracy.

18       6.    Defendant understands that for defendant to be guilty of
19  the crime charged in count two of the case United States v. National
20  Distribution Services, Inc., et al., ED CR No. 5:18-00114(B)-VAP,
21  that is, Welding without Required Certifications, in violation of 49
22  U.S.C. § 5124 and 49 C.F.R. § 180.413(a)(1), the following must be
23  true: (1) defendant violated, or caused the violation of, a federal
24  hazardous materials regulation; and (2) defendant had knowledge of
25  the facts giving rise to the violation, and had knowledge that his
26  conduct, or the conduct that he caused to take place, was unlawful,
27  or defendant displayed a deliberate indifference or conscious
28  disregard to the consequences of his conduct.

1        7.    Defendant understands that for defendant to be guilty of
2    the crime charged in count four of the case United States v. National
3    Distribution Services, Inc., et al., ED CR No. 5:18-00114(B)-VAP,
4    that is, Tax Evasion, in violation of 26 U.S.C. § 7201, the following
5    must be true: (1) defendant owed federal income tax for a calendar
6    year; (2) defendant made an affirmative attempt to evade or defeat
7    such income tax; and (3) in attempting to evade or defeat such tax,
8    the defendant acted willfully.

9        8.    Defendant understands that for defendant to be guilty of
10   the crime charged in count one of the case United States v. Western
11   Distribution, LLC, et al., ED CR No. 5:21-00170-VAP, that is,
12   Conspiracy to Commit Bank Fraud/Committed while on Pre-trial Release,
13   in violation of 18 U.S.C. §§ 1349 and 3147, the following must be
14   true: (1) there was an agreement between two or more persons to
15   commit bank fraud as charged in the indictment; (2) defendant became
16   a member of the conspiracy knowing of at least one of its objects and
17   intending to help accomplish it; (3) one of the members of the
18   conspiracy performed at least one overt act on for the purpose of
19   carrying out the conspiracy; and (4) during the commission of this
20   felony offense, defendant was on pre-trial release in the criminal
21   case of United States v. National Distribution Services, Inc., et
22   al., 5:18-CR-114(B)-VAP, in the United States District Court for the
23   Central District of California.

24       9.    Defendant understands that for defendant to be guilty of
25   the crime charged in count three of the case United States v. Western
26   Distribution, LLC, et al., ED CR No. 5:21-00170-VAP, that is, Bank
27   Fraud/Committed while on Pre-trial Release, in violation of 18 U.S.C.
28   §§ 1344(2) and 3147, the following must be true: (1) defendant

9

1  knowingly carried out a scheme or plan to obtain money or property

2  from a bank by making false statements or promises; (2) defendant

3  knew that the statements or promises were false; (3) the statements

4  or promises were material, that is, they had a natural tendency to

5  influence, or were capable of influencing, a financial institution to

6  part with money or property; (4) defendant acted with the intent to

7  defraud; (5) the bank was federally insured; and (6) during the

8  commission of this felony offense, defendant was on pre-trial release

9  in the criminal case of United States v. National Distribution

10  Services, Inc., et al., 5:18-CR-114(B)-VAP, in the United States

11  District Court for the Central District of California.

12                          PENALTIES AND RESTITUTION

13      10.   Defendant understands that the statutory maximum sentence

14  that the Court can impose for a violation of 18 U.S.C. § 371, is:

15  five years imprisonment; a three-year period of supervised release; a

16  fine of $250,000 or twice the gross gain or gross loss resulting from

17  the offense, whichever is greatest; and a mandatory special

18  assessment of $100.

19      11.   Defendant understands that the statutory maximum sentence

20  that the Court can impose for a violation of 49 U.S.C. § 5124, is:

21  five years imprisonment, or ten years in any case in which the

22  violation involves the release of a hazardous material that results

23  in death or bodily injury to any person; a three-year period of

24  supervised release; a fine of $250,000 or twice the gross gain or

25  gross loss resulting from the offense, whichever is greatest; and a

26  mandatory special assessment of $100.

27      12.   Defendant understands that the statutory maximum sentence

28  that the Court can impose for a violation of 26 U.S.C. § 7201, is:

                                    10

1　　five years imprisonment; a three-year period of supervised release; a
2　　fine of $250,000 or twice the gross gain or gross loss resulting from
3　　the offense, whichever is greatest; and a mandatory special
4　　assessment of $100.

5　　　　　13.　Defendant understands that the statutory maximum sentence
6　　that the Court can impose for a violation of 18 U.S.C. § 1349, is: 30
7　　years imprisonment; a five-year period of supervised release; a fine
8　　of $1,000,000 or twice the gross gain or gross loss resulting from
9　　the offense, whichever is greatest; and a mandatory special
10　　assessment of $100.

11　　　　　14.　Defendant understands that the statutory maximum sentence
12　　that the Court can impose for a violation of 18 U.S.C. § 1344(2), is:
13　　30 years imprisonment; a five-year period of supervised release; a
14　　fine of $1,000,000 or twice the gross gain or gross loss resulting
15　　from the offense, whichever is greatest; and a mandatory special
16　　assessment of $100.

17　　　　　15.　Defendant understands that the statutory maximum sentence
18　　that the Court can impose for a violation of 18 U.S.C. § 3147, is:
19　　ten years imprisonment, to be served consecutive to the underlying
20　　offense.

21　　　　　16.　Defendant understands, therefore, that the total maximum
22　　sentence for all offenses to which defendant is pleading guilty is:
23　　100 years imprisonment; a five-year period of supervised release; a
24　　fine of $2,750,000 or twice the gross gain or gross loss resulting
25　　from the offenses, whichever is greatest; and a mandatory special
26　　assessment of $500.

27　　　　　17.　Defendant understands and agrees that the Court: (a) may
28　　order defendant to pay restitution in the form of any additional

11

1   taxes, interest, and penalties that defendant owes to the United
2   States based upon the count of conviction (count four of United
3   States v. National Distribution Services, Inc., et al., ED CR No.
4   5:18-00114(B)-VAP) and any relevant conduct, including taxes owed for
5   years 2012, 2014, 2015, 2016, and 2017; and (b) must order defendant
6   to pay the costs of prosecution, which may be in addition to the
7   statutory maximum fine stated above.

8        18.   Defendant understands that defendant will be required to
9   pay full restitution to the victims of the offenses to which
10  defendant is pleading guilty in United States v. Western
11  Distribution, LLC, et al., ED CR No. 5:21-00170-VAP.   Defendant
12  agrees that, in return for the USAO's compliance with its obligations
13  under this agreement, the Court may order restitution to persons
14  other than the victims of the offenses to which defendant is pleading
15  guilty (in United States v. Western Distribution, LLC, et al., ED CR
16  No. 5:21-00170-VAP) and in amounts greater than those alleged in the
17  counts to which defendant is pleading guilty.   In particular,
18  defendant agrees that the Court may order restitution (in United
19  States v. Western Distribution, LLC, et al., ED CR No. 5:21-00170-
20  VAP) to any victim of any of the following for any losses suffered by
21  that victim as a result: (a) any relevant conduct, as defined in
22  U.S.S.G. § 1B1.3, in connection with the offenses to which defendant
23  is pleading guilty; and (b) any counts dismissed pursuant to this
24  agreement as well as all relevant conduct, as defined in U.S.S.G.
25  § 1B1.3, in connection with those counts and charges.   The parties
26  currently believe that the applicable amount of restitution is
27  approximately $668,427, and includes the United States Small Business
28  Administration and BAC Community Bank as victims, but recognize and

1   agree that this amount could change based on facts that come to the
2   attention of the parties prior to sentencing.

3       19.   Defendant agrees to make full restitution to the victims of
4   the offense alleged in count two (Welding without Required
5   Certifications) of United States v. National Distribution Services,
6   Inc., et al., ED CR No. 5:18-00114(B)-VAP), to which defendant is
7   pleading guilty.  These victims are Danny Lopez Velasquez and the
8   beneficiaries of decedent Samuel Enciso.

9       20.   Defendant understands that supervised release is a period
10  of time following imprisonment during which defendant will be subject
11  to various restrictions and requirements.  Defendant understands that
12  if defendant violates one or more of the conditions of any supervised
13  release imposed, defendant may be returned to prison for all or part
14  of the term of supervised release authorized by statute for the
15  offense that resulted in the term of supervised release, which could
16  result in defendant serving a total term of imprisonment greater than
17  the statutory maximum stated above.

18      21.   Defendant understands that, by pleading guilty, defendant
19  may be giving up valuable government benefits and valuable civic
20  rights, such as the right to vote, the right to possess a firearm,
21  the right to hold office, and the right to serve on a jury. Defendant
22  understands that he is pleading guilty to a felony and that it is a
23  federal crime for a convicted felon to possess a firearm or
24  ammunition.  Defendant understands that the convictions in this case
25  may also subject defendant to various other collateral consequences,
26  including but not limited to revocation of probation, parole, or
27  supervised release in another case and suspension or revocation of a
28  professional license.  Defendant understands that unanticipated

13

1  collateral consequences will not serve as grounds to withdraw
2  defendant's guilty pleas.

3      22.  Defendant understands that, if defendant is not a United
4  States citizen, the felony convictions in this case may subject
5  defendant to: removal, also known as deportation, which may, under
6  some circumstances, be mandatory; denial of citizenship; and denial
7  of admission to the United States in the future.  The Court cannot,
8  and defendant's attorney also may not be able to, advise defendant
9  fully regarding the immigration consequences of the felony
10 conviction[s] in this case.  Defendant understands that unexpected
11 immigration consequences will not serve as grounds to withdraw
12 defendant's guilty pleas.

13                          FACTUAL BASIS

14      23.  Defendant admits that defendant is, in fact, guilty of the
15 offenses to which defendant is agreeing to plead guilty.  Defendant
16 and the USAO agree to the statement of facts attached hereto as
17 Exhibit 1, and incorporated herein by reference, and agree that this
18 statement of facts is sufficient to support pleas of guilty to the
19 charges described in this agreement but is not meant to be a complete
20 recitation of all facts relevant to the underlying criminal conduct
21 or all facts known to either party that relate to that conduct.

22            NO AGREEMENT REGARDING SENTENCING FACTORS

23      24.  Except as set forth in paragraphs 4(e) and (f) above,
24 defendant and the USAO have no agreement as to the appropriate
25 sentence or the applicable Sentencing Guidelines factors.  Except as
26 set forth in paragraphs 4(e) and (f) above, both parties reserve the
27 right to seek any sentence within the statutory maximum, and to argue
28 for any criminal history score and category, base offense level,

                              14

1   specific offense characteristics, adjustments, departures, and
2   variances.

3        25.  Except as set forth in paragraphs 4(e) and (f) above,
4   defendant and the USAO reserve the right to argue for a sentence
5   outside the sentencing range established by the Sentencing Guidelines
6   based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2),
7   (a)(3), (a)(6), and (a)(7).

8                    WAIVER OF CONSTITUTIONAL RIGHTS

9        26.  Defendant understands that by pleading guilty, defendant
10  gives up the following rights:

11            a.   The right to persist in a plea of not guilty.

12            b.   The right to a speedy and public trial by jury.

13            c.   The right to be represented by counsel -- and if
14  necessary have the Court appoint counsel -- at trial.  Defendant
15  understands, however, that, defendant retains the right to be
16  represented by counsel -- and if necessary have the Court appoint
17  counsel -- at every other stage of the proceeding.

18            d.   The right to be presumed innocent and to have the
19  burden of proof placed on the government to prove defendant guilty
20  beyond a reasonable doubt.

21            e.   The right to confront and cross-examine witnesses
22  against defendant.

23            f.   The right to testify and to present evidence in
24  opposition to the charges, including the right to compel the
25  attendance of witnesses to testify.

26            g.   The right not to be compelled to testify, and, if
27  defendant chose not to testify or present evidence, to have that
28  choice not be used against defendant.

15

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

### WAIVER OF APPEAL OF CONVICTION

27.  Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's convictions on the offenses to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

### LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

28.  Defendant agrees that, provided the Court imposes a total term of imprisonment on all counts of conviction of no more than the statutory maximum specified above, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided that the fine is within the statutory maximum, and the term of imprisonment is ten years or less; (e) the amount and terms of any restitution order, provided it requires payment of no more than $2,500,000; (f) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (g) any of the following conditions of probation or supervised

16

1  release imposed by the Court: the conditions set forth in Second
2  Amended General Order 20-04 of this Court; the drug testing
3  conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d).

4      29.  The USAO agrees that, provided all portions of the sentence
5  are at or below the statutory maximums specified above, the USAO
6  gives up its right to appeal any portion of the sentence, with the
7  exception that the USAO reserves the right to appeal the following:
8  (a) the amount of restitution ordered if that amount is less than
9  $926,989.

10  ## RESULT OF WITHDRAWAL OF GUILTY PLEA

11      30.  Defendant agrees that if, after entering [a] guilty pleas
12  pursuant to this agreement, defendant seeks to withdraw and succeeds
13  in withdrawing defendant's guilty pleas on any basis other than a
14  claim and finding that entry into this plea agreement was
15  involuntary, then (a) the USAO will be relieved of all of its
16  obligations under this agreement; and (b) should the USAO choose to
17  pursue any charge or any civil, administrative, or regulatory action
18  that was either dismissed or not filed as a result of this agreement,
19  then (i) any applicable statute of limitations will be tolled between
20  the date of defendant's signing of this agreement and the filing
21  commencing any such action; and (ii) defendant waives and gives up
22  all defenses based on the statute of limitations, any claim of pre-
23  indictment delay, or any speedy trial claim with respect to any such
24  action, except to the extent that such defenses existed as of the
25  date of defendant's signing this agreement.

26
27
28

17

1

EFFECTIVE DATE OF AGREEMENT

2      31.   This agreement is effective upon signature and execution of

3 all required certifications by defendant, defendant's counsel, and an

4 Assistant United States Attorney.

5

BREACH OF AGREEMENT

6      32.   Defendant agrees that if defendant, at any time after the

7 signature of this agreement and execution of all required

8 certifications by defendant, defendant's counsel, and an Assistant

9 United States Attorney, knowingly violates or fails to perform any of

10 defendant's obligations under this agreement ("a breach"), the USAO

11 may declare this agreement breached.  All of defendant's obligations

12 are material, a single breach of this agreement is sufficient for the

13 USAO to declare a breach, and defendant shall not be deemed to have

14 cured a breach without the express agreement of the USAO in writing.

15 If the USAO declares this agreement breached, and the Court finds

16 such a breach to have occurred, then: (a) if defendant has previously

17 entered [a] guilty pleas pursuant to this agreement, defendant will

18 not be able to withdraw the guilty pleas, and (b) the USAO will be

19 relieved of all its obligations under this agreement.

20      33.   Following the Court's finding of a knowing breach of this

21 agreement by defendant, should the USAO choose to pursue any charge

22 or any civil, administrative, or regulatory action that was either

23 dismissed or not filed as a result of this agreement, then:

24           a.    Defendant agrees that any applicable statute of

25 limitations is tolled between the date of defendant's signing of this

26 agreement and the filing commencing any such action.

27           b.    Defendant waives and gives up all defenses based on

28 the statute of limitations, any claim of pre-indictment delay, or any

18

1 | speedy trial claim with respect to any such action, except to the
2 | extent that such defenses existed as of the date of defendant's
3 | signing this agreement.

4 |         c.   Defendant agrees that: (i) any statements made by
5 | defendant, under oath, at the guilty plea hearing (if such a hearing
6 | occurred prior to the breach); (ii) the agreed to factual basis
7 | statement in this agreement; and (iii) any evidence derived from such
8 | statements, shall be admissible against defendant in any such action
9 | against defendant, and defendant waives and gives up any claim under
10 | the United States Constitution, any statute, Rule 410 of the Federal
11 | Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal
12 | Procedure, or any other federal rule, that the statements or any
13 | evidence derived from the statements should be suppressed or are
14 | inadmissible.

15 | ### COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES
16 | ### OFFICE NOT PARTIES

17 |    34.  Defendant understands that the Court and the United States
18 | Probation and Pretrial Services Office are not parties to this
19 | agreement and need not accept any of the USAO's sentencing
20 | recommendations or the parties' agreements to facts or sentencing
21 | factors.

22 |    35.  Defendant understands that both defendant and the USAO are
23 | free to: (a) supplement the facts by supplying relevant information
24 | to the United States Probation and Pretrial Services Office and the
25 | Court, (b) correct any and all factual misstatements relating to the
26 | Court's Sentencing Guidelines calculations and determination of
27 | sentence, and (c) argue on appeal and collateral review that the
28 | Court's Sentencing Guidelines calculations and the sentence it

1   chooses to impose are not error.  While this paragraph permits both
2   the USAO and defendant to submit full and complete factual
3   information to the United States Probation and Pretrial Services
4   Office and the Court, even if that factual information may be viewed
5   as inconsistent with the facts agreed to in this agreement, this
6   paragraph does not affect defendant's and the USAO's obligations not
7   to contest the facts agreed to in this agreement.

8        36.  Defendant understands that even if the Court ignores any
9   sentencing recommendation, finds facts or reaches conclusions
10  different from those agreed to, and/or imposes any sentence up to the
11  maximum established by statute, defendant cannot, for that reason,
12  withdraw defendant's guilty pleas, and defendant will remain bound to
13  fulfill all defendant's obligations under this agreement.  Defendant
14  understands that no one -- not the prosecutor, defendant's attorney,
15  or the Court -- can make a binding prediction or promise regarding
16  the sentence defendant will receive, except that it will be within
17  the statutory maximum.

18                        NO ADDITIONAL AGREEMENTS

19       37.  Defendant understands that, except as set forth herein,
20  there are no promises, understandings, or agreements between the USAO
21  and defendant or defendant's attorney, and that no additional
22  promise, understanding, or agreement may be entered into unless in a
23  writing signed by all parties or on the record in court.

24          PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

25       38.  The parties agree that this agreement will be considered
26  part of the record of defendant's guilty plea hearing as if the
27  entire agreement had been read into the record of the proceeding.

28

20

1  | AGREED AND ACCEPTED

2  | UNITED STATES ATTORNEY'S OFFICE
   | FOR THE CENTRAL DISTRICT OF
3  | CALIFORNIA

4  | TRACY L. WILKISON
   | Acting United States Attorney

5

6  | *Matthew W. O'Brien*                    August 11, 2021
   | MATTHEW O'BRIEN                         Date
7  | JOSEPH O. JOHNS
   | Assistant United States Attorneys

8

9  | CARL BRADLEY JOHANSSON                  Date
   | Defendant

10

11 | MARK J. WERKSMAN                        Date
   | Attorney for Defendant Carl Bradley
12 | Johansson

13

14

15 |                     CERTIFICATION OF DEFENDANT

16 |      I have read this agreement in its entirety.  I have had enough

17 | time to review and consider this agreement, and I have carefully and

18 | thoroughly discussed every part of it with my attorney.  I understand

19 | the terms of this agreement, and I voluntarily agree to those terms.

20 | I have discussed the evidence with my attorney, and my attorney has

21 | advised me of my rights, of possible pretrial motions that might be

22 | filed, of possible defenses that might be asserted either prior to or

23 | at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

24 | of relevant Sentencing Guidelines provisions, and of the consequences

25 | of entering into this agreement.  No promises, inducements, or

26 | representations of any kind have been made to me other than those

27 | contained in this agreement.  No one has threatened or forced me in

28 | any way to enter into this agreement.  I am satisfied with the

1  representation of my attorney in this matter, and I am pleading
2  guilty because I am guilty of the charges and wish to take advantage
3  of the promises set forth in this agreement, and not for any other
4  reason.

5
6  CARL BRADLEY JOHANSSON                    Date  8/12/21
7  Defendant

8                   CERTIFICATION OF DEFENDANT'S ATTORNEY

9      I am Carl Bradley Johansson's attorney.  I have carefully and
10  thoroughly discussed every part of this agreement with my client.
11  Further, I have fully advised my client of his rights, of possible
12  pretrial motions that might be filed, of possible defenses that might
13  be asserted either prior to or at trial, of the sentencing factors
14  set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines
15  provisions, and of the consequences of entering into this agreement.
16  To my knowledge: no promises, inducements, or representations of any
17  kind have been made to my client other than those contained in this
18  agreement; no one has threatened or forced my client in any way to
19  enter into this agreement; my client's decision to enter into this
20  agreement is an informed and voluntary one; and the factual basis set
21  forth in this agreement is sufficient to support my client's entry of
22  guilty pleas pursuant to this agreement.

23
24  MARK J. WERKSMAN                          Date  8/12/21
25  Attorney for Defendant Carl Bradley
    Johansson
26
27
28
                                  22

Exhibit 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit 1**

Statement of Facts in Support of Carl Bradley Johansson's

Consolidated Plea Agreement

I.    **United States v. National Distribution Services, Inc., et al.,**

**ED CR No. 5:18-00114(B)-VAP**

CARL BRADLEY JOHANSSON, also known as ("aka") "Brad Johnson,"
aka "Carl Johnson," aka "C. Brad Johanson," aka "Keith Golatta"
("defendant"), controlled and operated co-defendant NATIONAL
DISTRIBUTION SERVICES, INC., aka "NDSI" ("NATIONAL"), from
approximately 2009 to 2015.  From approximately 2015 to the present,
defendant controlled and operated co-defendant WHOLESALE
DISTRIBUTION, INC., dba "Quality Services" ("WHOLESALE").

From approximately 2009 to 2015, co-defendant NATIONAL was a
private motor carrier engaged in the transportation of cargo via
commercial motor vehicles, commonly referred to as tractor-trailers
or tanker trucks.  NATIONAL specialized in transporting hazardous *and water*
materials such as petroleum fuels, including gasoline, in cargo tanks
known as MC 306 tanks.  NATIONAL's primary place of business was
340/344 North Grant Avenue, Corona, California (the "Property").
NATIONAL employed drivers to operate commercial motor vehicles on
routes in California and elsewhere.

In late 2014 and early 2015, defendant transformed NATIONAL into
a new entity, co-defendant WHOLESALE.  WHOLESALE also was a private
motor carrier engaged in the transportation of cargo via tractor-
trailers.  WHOLESALE also specialized in transporting hazardous
materials in specification and non-specification MC 306 tanks.
WHOLESALE's primary place of business was also the Property.

1  WHOLESALE also employed drivers to operate commercial motor vehicles
2  on routes in California.

3  **A.  Count One (First Conspiracy Object) and Count Two**

4      With constant usage over time, the MC 306 cargo tanks used by
5  defendant and his businesses, NATIONAL and WHOLESALE, to transport
6  hazardous materials required various repairs, including modifications
7  and welding.  Defendant authorized and caused co-defendant NATIONAL's
8  employees to conduct repairs, modifications, and welding on MC 306
9  cargo tanks.

10     The federal Hazardous Materials Transportation Statute ("HMTS"),
11  Title 49, United States Code, Section 5101 et seq., was enacted by
12  Congress to protect people and property from the dangers inherent in
13  transporting hazardous materials.  The regulations promulgated under
14  the HMTS explicitly defined hazardous materials to include crude oil
15  and other petroleum products.  The HMTS and the regulations enacted
16  thereunder were administered and enforced by the U.S. Department of
17  Transportation ("US DOT").  These regulations applied to individuals
18  and companies, like defendant and NATIONAL and WHOLESALE, who
19  transported hazardous materials in commerce or who caused hazardous
20  materials to be transported in commerce.  Cargo tanks used for the
21  transportation of hazardous materials included MC 306 cargo tanks,
22  which were defined under the regulations as a type of "specification
23  cargo tank."

24     The HMTS regulations required that certain repairs or
25  modifications of a specification cargo tank must have been made by a
26  repair facility holding a valid National Board Certificate of
27  Authorization for use of the National Board "R" Stamp and must have
28  been made in accordance with the edition of the National Board

2

1    Inspection Code in effect at the time the work was performed.
2    Neither defendant, nor his co-defendants in this matter, were
3    authorized as a repair facility under the HMTS and the HMTS
4    regulations to conduct certain repairs or modifications of MC 306
5    cargo tanks because none of them held a valid National Board
6    Certificate of Authorization for use of the National Board "R" Stamp
7    and because certain tank repairs and modifications made to MC 306
8    cargo tanks by NATIONAL's employees were not made in accordance with
9    the edition of the National Board Inspection Code.

10        At all times relevant to Counts One and Two of this matter,
11   defendant knew that both he and NATIONAL's employees were prohibited
12   by the HMTS and the HMTS regulations from conducting certain repairs
13   or modifications requiring an "R" Stamp, including welding, on the
14   shells of MC 306 cargo tanks.  Defendant knew of this prohibition 
15   because he had been convicted and sentenced to prison in April 2000,
16   in part, as the result of a 1993 cargo tank explosion that occurred
17   when one of defendant's welders conducted repairs on an MC 306 cargo
18   tanker in violation of the US DOT "R" Stamp and repair registration
19   requirements.[1]  In addition to knowing that he and his companies were
20   prohibited from conducting certain repairs or modifications on MC 306 
21   cargo tanks, defendant also knew that welding on the shells or
22   components of MC 306 cargo tanks was dangerous because the MC 306
23   cargo tanks were used to haul hazardous materials that could explode
24
25
26   [1] A copy of the Stipulated Statement of Facts from defendant's
     plea agreement in that matter, United States v. Carl Bradley
     Johansson, Case No. CR 98-674-RAP, is attached hereto as Exhibit 2 to
27   this plea agreement and is incorporated into this plea agreement and
     this factual basis by reference.  Defendant expressly accepts the
28   prior Stipulated Statement of Facts as true, and recants all prior
     claims that it was the result of coercion.

3

1  if not properly purged prior to conducting welding repairs or
2  modifications.  For example, defendant knew that in the 1993
3  incident, L.Q., a welder who worked for him, had been killed while
4  welding a cargo tank when L.Q.'s welding torch ignited fumes inside
5  the tank.  Defendant was also aware of a similar explosion that
6  occurred in NATIONAL's shop at the Property in September 2012.  The
7  explosion happened when NATIONAL employee, D.L.V., was welding on an
8  MC 306 cargo tanker.  As defendant knew, the explosion blew a large
9  hole in the roof of the warehouse and could have seriously injured
10 D.L.V.

11      As the person who controlled NATIONAL, defendant knew that
12 NATIONAL's employees S.E. and D.L.V. frequently conducted welding on
13 MC 306 cargo tanks operated by NATIONAL.  Defendant authorized co-
14 defendant Enrique Garcia ("Garcia," NATIONAL's Shop Foreman) to
15 instruct S.E. and D.L.V. to conduct welding operations as needed.
16 Beginning on a date no later than March 19, 2012, and continuing to
17 May 6, 2014, in Riverside County, within the Central District of
18 California, defendant knowingly conspired and agreed with other
19 individuals to conduct repairs on US DOT specification cargo tanks
20 used in the transportation of hazardous materials, in willful and
21 reckless violation of the HMTS and the HMTS regulations.  Defendant
22 and his co-conspirators directed and caused NATIONAL's welders S.E.
23 and D.L.V. to conduct welding repairs on MC 306 cargo tanks at the
24 Property, even though defendant and his co-conspirators knew that
25 neither they, nor NATIONAL, held a valid National Board Certificate
26 of Authorization authorizing the use of an "R" Stamp to conduct such
27 welding; and even if the cargo tanks had not been emptied of
28

4

1 │ hazardous materials or sufficiently cleaned of residue and purged of
2 │ vapors, as required by the HMTS and the HMTS regulations.

3 │     In furtherance of the conspiracy agreement and to accomplish the
4 │ object thereof, defendant and his co-conspirators committed various
5 │ over acts, including the following:

6 │         On May 5, 2014, defendant and Garcia discussed repairs that
7 │ they intended for employees to conduct on MC 306 cargo tank #678238
8 │ the following day. During that conversation, while standing next to
9 │ MC 306 cargo tank #678238, Garcia, among other things, showed
10 │ defendant the replacement parts for the cargo tank and pointed out
11 │ the location of repairs to be conducted on the top of the tank.
12 │ Defendant's discussion of the MC 306 cargo tank #678238 repairs was
13 │ captured on NATIONAL's multiple surveillance cameras. During his
14 │ discussion with Garcia regarding the proposed repairs, defendant can
15 │ be seen on the surveillance recordings moving closer to the cargo
16 │ tank to get a better look at the location of the needed repairs as
17 │ Garcia pointed out the repair location.

18 │     On the following day, May 6, 2014, Garcia directed S.E. and
19 │ D.L.V. to conduct welding repairs on cargo tank #678238 even though
20 │ the cargo tank had not been completely purged of its explosive
21 │ contents and fumes. Thereafter, S.E. and D.L.V. began using a metal
22 │ grinder on cargo tank #678238 to prepare the tank for the welding
23 │ repair project. Because the tank had not been completely purged of
24 │ its fumes and crude oil, the sparks generated by the welding repair
25 │ caused an explosion that killed S.E. and seriously injured D.L.V.
26 │ The explosion blew a hole in the warehouse's roof, just like the 2012
27 │
28 │

1  explosion.  The fatal explosion and its aftermath were captured on
2  several of NATIONAL's surveillance cameras.

3  **B.    Count One (Second Object)**

4      Following the fatal explosion on May 6, 2014, local, state, and
5  federal first responders, law enforcement agencies, and regulatory
6  agencies, including the US DOT Federal Motor Carrier Safety
7  Administration ("FMCSA") investigated the cause of the fatal
8  explosion.  During its investigation, the FMCSA determined that
9  NATIONAL's employees had been conducting illegal repairs,
10  modifications, and welding on specification cargo tanks, such as MC
11  306 cargo tank #678238 that exploded during the prohibited repair
12  operations.  As a result of this determination, on August 14, 2014,
13  the FMCSA issued an imminent hazard Out-of-Service Order (the
14  "Emergency Order") which prohibited NATIONAL from operating 37 cargo
15  tankers to haul gasoline or ethanol because it had determined that
16  those cargo tanks presented safety risks.  However, non-specification
17  use was still allowed.  Pursuant to the Emergency Order, NATIONAL was
18  not permitted to operate the 37 specified cargo tanks without
19  obtaining permission from FMCSA.  NATIONAL never obtained permission
20  from FMCSA to operate any of the 37 specified tanks to haul gasoline
21  or ethanol.

22      The HMTS and the HMTS regulations prohibit the creation of new,
23  or reincarnated, motor carriers to avoid compliance with federal law,
24  regulations, and safety orders.  "Carriers" are defined as motor
25  carriers with common ownership, common management, common control or
26  common familial relationship.  The HMTS regulations prohibit two or
27  more motor carriers, such as NATIONAL and WHOLESALE, from using
28  common ownership, common management, common control, or common

6

1  familial relationship to enable any or all such motor carriers to
2  avoid compliance, or mask or otherwise conceal non-compliance, or a
3  history of non-compliance.

4  Beginning on May 6, 2014 and continuing to April 15, 2018, in
5  Riverside County, within the Central District of California,
6  defendant and other employees of NATIONAL and WHOLESALE knowingly
7  conspired and agreed to impede, impair, obstruct, and defeat the US
8  DOT's efforts to investigate the May 6, 2014 fatal explosion and to
9  enforce federal laws and regulations related to out-of-service
10  orders, reincarnated carriers, and the "R" Stamp and purging
11  requirements for specification cargo tank repair work.   In
12  furtherance of the conspiracy agreement and to accomplish the object
13  thereof, defendant and his co-conspirators knowingly committed
14  various over acts, including the following:

15  Defendant and his co-conspirators made multiple false statements
16  to local, state, and federal investigators to conceal the illegal
17  welding repairs on MC 306 cargo tank #678238 and to conceal the fact
18  that defendant owned NATIONAL and Garcia, S.E., D.L.V., and others
19  worked for NATIONAL.

20  For example, when investigators arrived at the Property on May
21  6, 2014 to investigate the explosion of the MC 306 cargo tank,
22  defendant said that he was a Customer Service Representative for
23  Agri-Comm Express, and also claimed that welders S.E. and D.L.V. had
24  their salaries paid by a different company, called TankServices, LLC.
25  On September 3, 2014, defendant signed an affidavit, under oath, in
26  which he falsely claimed to federal regulators that defendant Garcia
27  worked for a company called TankServices, LLC instead of co-defendant
28  NATIONAL.   In the same affidavit, defendant also falsely claimed that

7

1  NATIONAL never had engaged in cargo tank repairs (including the
2  repairs carried out by S.E. and D.L.V. on or about May 6, 2014).
3  Later, on January 9, 2015, defendant told federal investigators that
4  he did not discuss the repairs of MC 306 cargo tanker #678238 with
5  Garcia prior to the explosion of that tank on May 6, 2014, despite
6  the fact that the surveillance camera recordings showed defendant and
7  Garcia discussing the planned repairs and modifications to the tank
8  on May 5, 2014.  During the investigation into the May 6, 2014
9  explosion, defendant claimed that he did not control NATIONAL because
10 he was merely a "paper pusher" who, at the time of the explosion,
11 purportedly worked for a temporary staffing company that had assigned
12 him to be an "administrative manager" at NATIONAL.  Furthermore,
13 during the federal and state investigation of the May 6, 2014
14 explosion, defendant told associates V.R. and M.C. to tell
15 investigators that V.R. and M.C. had purged MC 306 cargo tanker
16 #678238 before dropping it off for repairs in May 2014, even though
17 this was false.

18     After the FMCSA issued the Emergency Order to NATIONAL in August
19 2014, defendant and his co-conspirators caused NATIONAL to continue
20 operating tractor-trailer trucks to transport gasoline and ethanol in
21 MC 306 cargo tanks that were prohibited from hauling gasoline and
22 ethanol pursuant to the Emergency Order.  When they were unsuccessful
23 in challenging the Emergency Order, defendant and his co-conspirators
24 took steps to evade the FMCSA's Emergency Order.  Defendant shut down
25 NATIONAL and started WHOLESALE in late 2014 and early 2015.  As
26 defendant was aware, WHOLESALE had almost all of the same employees
27 and management as NATIONAL, and it operated out of the same warehouse
28 at the Property.  Defendant's co-conspirators made false statements

8

1   to federal regulators and local authorities in order to conceal the
2   fact that WHOLESALE was a reincarnation of NATIONAL.  Defendant and
3   his co-conspirators also concealed defendant's control of co-
4   defendant WHOLESALE from federal regulators.  For all intents and
5   purposes, WHOLESALE was a "reincarnated" or "chameleon" carrier,
6   created to avoid the regulatory restrictions imposed on NATIONAL.

7        WHOLESALE's violations of the Emergency Order continued through
8   early 2018.  On many occasions, WHOLESALE operated the prohibited
9   cargo tanks to haul gasoline or ethanol in violation of the Emergency
10  Order.

11       As part of the conspiracy and to further conceal his control of
12  NATIONAL and WHOLESALE, defendant did not file income tax returns for
13  calendar years 2012 through 2017, thus concealing from the federal
14  government the fact that he was earning income from NATIONAL and
15  WHOLESALE, and using that income to pay for personal expenses
16  totaling at least $1,174,173 in unreported income.

17       **C.   Count Four - Tax Evasion**

18       Defendant owed federal income tax for the calendar years 2012
19  through 2017.  Defendant made an affirmative attempt to evade or
20  defeat the assessment and payment of income taxes for those years.
21  In attempting to evade or defeat such taxes, defendant acted
22  willfully.

23       Defendant filed personal, federal income tax returns from 2002
24  through 2008.  In 2007, the Internal Revenue Service ("IRS") sued
25  defendant for employment taxes owed by his former hazardous material
26  transportation company, Atlas Bulk, Inc., from tax year 1995 (C.D.
27  Cal. Case No. 07-CV-659-AHS).  As a result of the IRS lawsuit, the
28  district court entered judgment against defendant in 2008 for

9

1   $923,440.   Thereafter, defendant stopped reporting his income to the
2   IRS and stopped filing personal federal income tax returns.   Instead,
3   defendant used the corporate accounts of NATIONAL and WHOLESALE to
4   pay for his personal expenses, including rent for his family home,
5   medical bills, and the high school and college tuitions of his four
6   children.   He directed L.S. (his longtime office manager and
7   bookkeeper at NATIONAL and WHOLESALE) to make such personal payments
8   on his behalf, and at times he made the payments himself using
9   corporate checks and debit cards.

10      The table below shows examples of defendant's unreported income
11   received from NATIONAL and WHOLESALE, and lists the purposes for
12   which some of those funds were paid on defendant's  behalf and to
13   whom they were paid.   The table also shows the amount of unreported
14   income received by defendant each year, and the corresponding amount
15   of federal income taxes that defendant evaded each year.

16

| Defendant's Unreported Income | | | | | | | |
|---|---|---|---|---|---|---|---|
|  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | TOTAL |
| **Personal Rent:** | | | | | | | |
| W.K. | $135,000 | $162,750 | $112,500 | $147,058 | $147,192 | $178,197 | **$882,697** |
| **Children's Tuition/Board:** | | | | | | | |
| Orange Lutheran | $46,592 | $49,740 | $32,337 | $10,187 | – | – | **$138,856** |
| Christ Lutheran | $5,500 | – | – | – | – | – | **$5,500** |
| Halstrom Acad. | – | $7,883 | $22,066 | $11,119 | $12,743 | $8,326 | **$62,138** |
| Texas A&M | – | – | $3,638 | $9,103 | $13,974 | $7,386 | **$34,103** |
| Callaway House | – | – | – | $2,668 | $907 | $470 | **$4,045** |
| **Medical:** | | | | | | | |
| Medquest | $13,108 | – | $5,684 | – | – | – | **$18,792** |

10

| Pharmacy | | | | | | | |
|---|---|---|---|---|---|---|---|
| California Specialty | – | $1,950 | – | – | – | – | $1,950 |
| Denine Rice DDS | – | – | $1,547 | $3,653 | – | – | $5,200 |
| **Other:** | | | | | | | |
| Kimco Staffing | – | – | $20,889 | – | – | – | $20,889 |
| **TOTAL** | $200,200 | $222,323 | $198,662 | $183,789 | $174,816 | $194,380 | $1,174,173 |
| **TAX OWED** | $52,045 | $59,851 | $50,735 | $45,235 | $42,002 | 48,694 | $298,562 |

1.  As part of his scheme to receive unreported income from NATIONAL and WHOLESALE, defendant knowingly and willfully committed several affirmative acts, including the following conduct:

When defendant established WHOLESALE in late 2014 with a nominee owner, J.C., he immediately used J.C. to open corporate accounts for WHOLESALE at American First National Bank and Bank of America. Defendant then obtained a signature stamp in J.C.'s name, which defendant used to control the accounts.  Defendant used the accounts to pay the rent for his house, his children's tuitions, and his medical expenses.  Defendant took company checks that he used for personal expenses out of the office drawer where they were stored at the Property.  He then either handwrote the checks himself or used a typewriter to fill them out.  Defendant rented a large home in Corona from his landlord, W.K., for at least $12,000 per month from 2012 through 2018.  Defendant included misleading notes on the rent checks to W.K. to make them look like legitimate business expenses.  For example, he labelled some as "Truck Yard Rental Payment," "Reimbursement of expenses," and "Loan Oak" (the companies' lender for its rented warehouse) in the checks' memo sections.  Defendant lied to

11

1  L.S. (his longtime administrative assistant)  by telling her that
2  company checks made payable to his landlord were rental payments for
3  the companies' ~~warehouse~~ rented. As a result, L.S. then recorded the
4  payments as rental payments in the companies' accounting software.
5  Defendant used NATIONAL's and WHOLESALE's corporate accounts to make
6  approximately $200,000 in tuition payments at his four children's
7  private high schools and university.  ~~He personally set up electronic~~
8  ~~checking account withdrawals from NATIONAL and WHOLESALE's accounts~~
9  ~~at two of the schools.~~  Defendant also directed L.S. to characterize
10 the tuition payments as "employee training" in NATIONAL's and
11 WHOLESALE's accounting records, despite the fact that none of
12 defendant's children worked at the companies.  Defendant was careful
13 to omit his own name on the corporate tax returns for co-defendants
14 NATIONAL or WHOLESALE, and he used an alias, "Keith Golatta," to sign
15 NATIONAL's corporate tax return for tax year 2012 (and he listed
16 "Golatta" as NATIONAL's President, Secretary, Treasurer, and Director
17 on corporate records for 2013) to conceal his unreported income from
18 those sources.

19      In total, for the calendar years 2012 through 2017, defendant
20 received at least $1,174,173 in unreported income from NATIONAL and
21 WHOLESALE, and knowingly and willfully evaded payment of at least
22 $298,562 in federal income taxes.

23

24 **II.   Factual Basis for United States v. Western Distribution, LLC, et**
   **al., ED CR No.  5:21-00170-VAP**
25
26      CARL BRADLEY JOHANSSON, aka "Brad Johnson," "Carl Johnson," aka
   "C. Brad Johanson," aka "Jay Johnson," aka "Keith Golatta"
27
   ("defendant"), controlled and operated co-defendant WESTERN.  From
28

                                   12

1   April 2018 through July 2021, defendant was on federal pretrial
2   release due to the felony charges pending against him in United
3   States v. National Distribution Services, Inc., et al., C.D. Cal.
4   Case No. 5:18-CR-114(B)-VAP.

5       Co-defendant WESTERN DISTRIBUTION, LLC, also known as ("aka")
6   "Advanced Distribution, Inc." ("WESTERN"), was a trucking company
7   based in San Bernardino County, California, that was engaged in the
8   business of transporting jet fuel.  Agri-Comm Express, Inc. ("Agri-
9   comm") was a trucking company based in Gustine, California, that was
10  engaged in the business of transporting agricultural products.  Carl
11  Stefan Johansson was defendant's son, and the alleged owner of
12  WESTERN.  L.S. was defendant's long-time employee and administrative
13  assistant at WESTERN.

14      In March 2019, defendant founded WESTERN and registered it as an
15  LLC in Wyoming.  At all times relevant to the indictment, defendant
16  controlled all aspects of WESTERN.  WESTERN was based in Buena Park,
17  California and then  Ontario, California, and focused on the
18  transportation of jet fuel.  In September 2019, defendant converted
19  WESTERN into Advanced Distribution, Inc. and then into Western
20  Distribution, Inc.

21      Beginning on a date unknown and continuing to July 21, 2021, in
22  San Bernardino County, within the Central District of California, and
23  elsewhere, defendant and WESTERN conspired with others to execute a
24  scheme to defraud a federally insured financial institution, namely,
25  BAC Community Bank ("BAC") in Stockton, California, as to material
26  matters, and to obtain moneys and funds owned by and in the custody
27  and control of the bank by means of material false and fraudulent
28

13

1  pretenses, representations, promises, and the concealment of material
2  facts.

4      In furtherance of the conspiracy and to accomplish the objects
5  of the conspiracy, defendant and WESTERN, and others,  committed
6  various overt acts within the Central District of California and
7  elsewhere, including, but not limited to, the following:

8      On April 15, 2020, at defendant's direction, Agri-comm applied
9  for a PPP loan in the amount of $286,505 from Bank of the West, a
10  federally insured financial institution.  Defendant told Agri-comm
11  how to fill out the responses on the PPP application.  At defendant's
12  direction, Agri-comm's PPP application claimed that Agri-comm had no
13  common management with any other businesses, even though defendant
14  had influence over and/or controlled Agri-comm and, at the same time,
15  he controlled WESTERN and Wholesale Distribution, Inc. ("Wholesale").
16  Agri-comm's application was approved, and Agri-comm received a PPP
17  loan in the amount of $286,500.

18      On April 24, 2020, at defendant's direction, WESTERN submitted a
19  PPP loan application  ("WESTERN's PPP Loan Application") to BAC,
20  seeking a PPP loan in the amount of $436,390.  Defendant instructed
21  L.S. regarding how to fill out the responses on the application.  As
22  part of WESTERN's PPP Loan Application, defendant caused  WESTERN to
23  fraudulently represent the following material facts to BAC: (a) that
24  WESTERN had the equivalent of 31 full-time employees, even though
25  WESTERN had laid off most of those employees prior to the submission
26  of the application; and (b) that the PPP funds WESTERN received would
27  be "used to retain workers and maintain payroll or make mortgage
28  interest payments, lease payments, and utility payments, as specified

14

1   under the Paycheck Protection Rule."  At defendant's direction,
2   WESTERN also fraudulently represented to BAC that WESTERN had no
3   common management with any other businesses, even though JOHANSSON
4   controlled WESTERN and Wholesale and had influence and/or control
5   over Agri-comm.

6        On May 5, 2020, WESTERN obtained a PPP loan in the amount of
7   $436,390 after defendant caused its fraudulent PPP loan application
8   to be submitted to BAC.  Between May 7, 2020 and June 11, 2020,
9   defendant caused WESTERN to spend at least $435,000 of its PPP loan,
10  mostly on business expenses unrelated to its payroll, because the
11  company had laid off most of its employees before it even applied for
12  the PPP loan.  On May 16, 2020, defendant added his son, Carl Stefan
13  Johansson, to WESTERN's payroll, even though defendant had previously
14  represented in WESTERN's PPP Loan Application that his son already
15  owned WESTERN and even though his son worked for  a different company
16  at the time.

17       On approximately September 22, 2020, defendant caused the
18  fraudulent transfer of 21 of Agri-comm's employees ("Agri-comm's 21
19  Employees") to WESTERN's payroll account (effective as of September
20  16, 2020), even though those employees continued to work for Agri-
21  comm rather than WESTERN.  These same employees had been listed as
22  Agri-comm's employees in Agri-comm's PPP loan application.
23  Defendant's intent in transferring the 21 Agri-comm Employees to
24  WESTERN's payroll was to increase WESTERN's payroll so that it would
25  look like WESTERN had spent at least sixty percent of its PPP loan on
26  its payroll, as required by the PPP, so that WESTERN's entire PPP
27  loan could be forgiven.

28

15

1    Between September 16, 2020 and October 19, 2020, at defendant's
2    direction, WESTERN paid Agri-comm's 21 Employees approximately
3    $87,722, even though Agri-comm's 21 Employees did not work for
4    WESTERN.   Between September 2020 through December 2020, at
5    defendant's direction, Agri-comm wired approximately $339,900 from
6    Agri-comm's bank account to WESTERN's bank account to reimburse
7    WESTERN for the money that it was using to pay Agri-comm's 21
8    Employees.   On December 28, 2020, defendant sent an email to the
9    employee at Agri-comm who handled payroll issues, writing "[M]ake
10   this the last week . . . go back to your own next week."   On December
11   29, 2020, the employee at Agri-comm replied to defendant, writing,
12   "We will go ahead and run the weekly payroll information we have you
13   yesterday under the Western trucker account. . . . We will go back to
14   everyone under the Agri-Comm Express, Inc. account next week."

15       On January 19, 2021, defendant caused  WESTERN to submit a loan
16   forgiveness application (the "Loan Forgiveness Application") to BAC,
17   in which WESTERN requested that its entire $436,390 loan be forgiven
18   pursuant to the PPP rules.  As part of the Loan Forgiveness
19   Application, defendant caused WESTERN to certify to BAC that "[t]he
20   dollar amount for which forgiveness is requested was used to pay
21   costs that are eligible for forgiveness" and that "[t]he information
22   provided in this application and the information provided in all
23   supporting documents and forms is true and correct in all material
24   respects."  As part of the Loan Forgiveness Application, defendant
25   caused WESTERN to represent to BAC that Agri-comm's 21 Employees were
26   WESTERN's employees between the dates of May 5, 2020 and October 19,
27   2020, and that the employees were paid approximately $87,722 by
28   WESTERN during that period, even though Agri-comm's 21 Employees did

16

1  not actually work for WESTERN and Agri-comm had reimbursed WESTERN
2  for those 21 Employees' payroll expenses.  Later, on February 22,
3  2021, WESTERN represented to BAC that WESTERN had three different
4  departments and three different payroll journals, but concealed from
5  BAC that one of those "departments" actually consisted of Agri-comm's
6  21 Employees.

7       On March 24, 2021, at defendant's direction, WESTERN applied for
8  a second PPP loan (the "Second PPP Loan Application"), also through
9  BAC, seeking a PPP loan in the amount of $231,527.  Again, defendant
10 directed WESTERN regarding how to fill out the application.  As part
11 of this Second PPP Loan Application, defendant caused WESTERN to make
12 the following fraudulent and material representation to BAC: that the
13 PPP funds that WESTERN received would be "used to retain workers and
14 maintain payroll or make mortgage interest payments, lease payments,
15 and utility payments, as specified under the Paycheck Protection
16 Rule."  As part of the Second PPP Loan Application, defendant caused
17 WESTERN to fraudulently submit to BAC its purported payroll, yet omit
18 to disclose a significant, material fact to BAC, namely, that many of
19 the individuals that it had listed as its own employees were actually
20 employed by Agri-comm rather than WESTERN.  Defendant again caused
21 WESTERN to claim to BAC, falsely, that WESTERN had no common
22 management with any other businesses.

23      On March 24, 2021, as a result of its submission of the
24 fraudulent Second PPP Loan Application, WESTERN obtained a PPP loan
25 in the amount of $231,527.

26
27
28

Exhibit 2

STIPULATED STATEMENT OF FACTS

1.     Defendant CARL BRADLEY JOHANSSON was the president and owner of a privately-owned trucking business that operated under the names Petroleum Delivery Service, Ash Incorporated, Ash Transportation, Atlas Carriers, Inc., and Atlas Bulk, Inc. (collectively "Atlas").  Atlas maintained corporate offices in both Montebello and Paramount, California.  Atlas also maintained and operated truck terminals throughout California, including sites in Oxnard, Bakersfield, Paso Robles, Paramount, and Montebello.  Atlas was a private motor carrier engaged in the intrastate and interstate transportation of cargo via commercial motor vehicles, commonly referred to as tractor-trailers or tanker trucks.  Atlas specialized in transporting hazardous materials such as petroleum fuels, primarily gasoline, in cargo tanks known as "MC 306" tanks.  Atlas also employed drivers at its terminals to operate its commercial motor vehicles on routes throughout California and the western United States.

2.     George Granados was employed by Atlas as vice-president of fleet operations, and was responsible for, among other things, overseeing and managing the maintenance, repair, and servicing of tractor-trailer trucks and cargo tanks.

3.     Atlas had neither applied for nor was registered as a repair facility for repairing cargo tanks at any of its facilities, offices, or terminals.  Atlas was therefore not a registered repair facility, and as such, was not permitted by the United States Department of Transportation ("US DOT") to engage, or permit others to engage, in the repair of cargo tanks, including MC 306 tanks, at any of its facilities.

4.     Beginning at a time prior to September 27, 1993, in Los Angeles County, defendant and George Granados conspired and agreed to willfully violate regulations prescribed by the Hazardous Materials Transportation Safety Act for the repair of cargo tanks used in the transportation of hazardous materials.

5.     In furtherance of the agreement and to accomplish the object thereof, defendant and Granados committed various overt acts, including, but not limited to, the following:

        a.     On or about December 24, 1992, defendant mailed a letter to Gary Burley, US DOT, Office of Motor Carriers, which falsely stated that Atlas was in the process of applying for an "R" stamp, and that Atlas would use "authorized vendors" to repair leaking cargo tanks.

        b.     On or about the following dates, defendant and Granados caused a welder to conduct repairs on the below-listed

7

USAO_00035846

MC 306 cargo tanks at the Atlas facility located at 751 South
Vail Avenue, Montebello, California, which was a facility that
did not hold a valid National Board Certificate authorizing the
use of an "R" stamp and was not registered with US DOT:

| APPROX. DATE(S) | VEHICLE NO. | SERIAL NO. |
|---|---|---|
| 1/27/93 | 52A | TT 17433B |
| 2/2/93 | 50 | T 17433 |
| 2/9/93- 2/10/93 | 15A | 125214 |
| 4/13/93 | 80A | STN 172986 |
| 4/27/93 | 32A | TT 14815 |
| 6/9/93 | 15A | 125214 |
| 6/23/93- 6/24/93 | 89A | F 17090 |
| 7/1/93 | 51A | 125333 |
| 7/2/93 | 67A | TT 17998 |
| 9/27/93 | 113A | K1-10023 |

6.    During this time period, defendant knew that Atlas was
not authorized to engage in the repair of cargo tanks at the
Montebello facility.

7.    Beginning at a time prior to and ending on
approximately July 10, 1996, in Los Angeles County, defendant and
others agreed to willfully violate regulations prescribed by the
Hazardous Materials Transportation Safety Act for the safe
driving limitations on hours of service and creation and
maintenance of driver's logs by drivers transporting hazardous
materials. Specifically, defendant and others agreed to allow
Atlas drivers to drive in excess of hours of duty prescribed by
US DOT and to conceal such violations by falsifying records
required to be maintained by US DOT, including records of duty
status (commonly referred to as "driver logs" or "spread sheets").

8.    In furtherance of the agreement and to accomplish the
object thereof, defendant and others committed various overt
acts, including, but not limited to, the following:

a.    Between on or about February 6, 1995 and February
7, 1995, defendant and others caused to be created, false and

8

USAO_00035847

fraudulent driver logs for Atlas employee Robert Hill indicating that Hill was off duty on those dates, when, on those dates, Hill actually worked a total of 25 hours at Atlas' Paso Robles terminal.

      b.  On or about February 9, 1995, defendant and others caused to be created, false and fraudulent driver logs for Atlas employee Lee Bagleman indicating that Bagleman was off duty on that date, when, on that date, Bagleman actually drove 18.25 hours out of Atlas' Paso Robles terminal.

      c.  On or about February 24, 1995, defendant and others caused to be created, false and fraudulent driver logs for Atlas employee Robert Silveira indicating that Silveira transported two loads for a total of eight hours on that date, when, on that date, Silveira actually transported four loads for a total of 14 hours out of Atlas' Paso Robles terminal.

      d.  On or about May 17, 1995, defendant and others caused to be created, false and fraudulent driver logs for Atlas employee Michael Schlagenhauser indicating that Schlagenhauser was off duty for a 24-hour period, when, on that date, Schlagenhauser actually worked 10 hours at Atlas' Oxnard terminal.

9

USAO_00035848